Case 8:08-cv-02581-AW   Document 24   Filed 09/25/09   Page 1 of 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| MARIA PAULA ROBLEDO, *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| ) | Civil Action No. AW-08-2581 |
| v. ) | |
| ) | |
| MICHAEL CHERTOFF, ) | |
| Secretary, United States Department of ) | |
| Homeland Security, *et al.*, ) | |
| ) | |
| Respondents. ) | |

## **MEMORANDUM OPINION**

Before this Court is a Motion to Dismiss, or Alternatively, for Summary Judgment (Doc. No. 8) filed on behalf of Michael Chertoff,[1] in his official capacity as Secretary of U.S. Department of Homeland Security ("DHS"), and Jonathan Scharfen,[2] in his official capacity as Acting Director of U.S. Citizenship and Immigration Services ("USCIS"), referred to collectively as the "Government" or "Respondents." Also before this Court is Maria P. Robledo, her son Mateo Pinzon, and Zainab M. Hassan-Norris's, collectively referred to as "Petitioners," Cross Motion for Summary Judgment. (Doc. No. 11.) The Government's motion seeks to dismiss Petitioners' complaint for declaratory relief, injunctive relief, and writ of mandamus concerning the denial of their application and petition to have their immigration status adjusted to lawful permanent resident following the deaths of their citizen spouses.[3]

---

[1] As of January 21, 2009, Janet Napolitano serves as the Secretary of DHS.
[2] As of August 12, 2009, Alejandro Mayorkas serves as the Director of USCIS.
[3] Because Petitioner Mateo Pinzon is not the biological child of a U.S. citizen, his adjustment of status application depends on his alien mother's classification as a spouse. 8 U.S.C. § 1151(b)(2)(A)(i) (2006). Therefore, this Memorandum of Opinion frequently refers to the Petitioners and their citizen relatives, as "spouses", even though Mr. Pinzon was the step-child of a U.S. citizen.

1

The central issues with respect to both motions are (1) whether this Court has subject matter jurisdiction and (2) whether the deaths of the Petitioners' citizen spouses, prior to their second wedding anniversaries, automatically disqualifies them from treatment as "immediate relative[s]" under 8 U.S.C. § 1151(b)(2)(A)(i).  For the reasons set forth below, this Court finds that it has jurisdiction to hear the matter and that Petitioners are each eligible for classification as an "immediate relative" of their citizen spouses who died before the couple's second year of marriage because the citizens filed an I-130 petition prior to their deaths.  Accordingly, the Respondents' Motion to Dismiss, or Alternatively, for Summary Judgment is DENIED and Petitioners' Cross-Motion for Summary Judgment is GRANTED.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Maria Paula Robledo (Robledo) and her son, Mateo Pinzon, are citizens of Colombia.  They entered the United States in 2004 in nonimmigrant status.  Mrs. Robledo married Duglio Renato Ricci, a naturalized U.S. citizen, on July 11, 2006, while Pinzon was still a minor.  Mr. Ricci filed a Form I-130, Petition for Alien Relative ("Petition"), in September 2006 to establish Mrs. Robledo and her son as "immediate relative[s]."  Simultaneously, Mrs. Robledo and Pinzon filed a Form I-485, Application to Register Permanent Residence or to Adjust Status ("Application"), seeking adjustment of their immigration status to lawful permanent resident and relying on Mr. Ricci's petition attesting to their status as spouse and child, respectively.  While their petition and application were pending approval, Mr. Robledo died, just ten months after the couple married.  On June 15, 2007, fifteen days after Mr. Robledo's death, the Respondents denied the petition and application jointly filed by the couple and Mrs. Robledo's son, solely based on the Government's policy of treating aliens whose spouses died prior to the couples' second wedding anniversary, as no longer the spouses of U.S.

citizens.  As a result, Mrs. Robledo no longer possessed a valid visa and was placed in removal proceedings.

Petitioner Zainab M. Hassan-Norris is a citizen of Sierra Leone and entered the United States in 1994 in nonimmigrant status.  On September 23, 2002, Hassan-Norris married Larry Vincent Norris, a U.S. Citizen, and gave birth to the couple's son on October 2, 2003.  Meanwhile, on November 12, 2002, Mr. Norris filed a Form I-130 petition and Mrs. Hassan-Norris filed her Form I-485 application, relying on her spouse's petition attesting to her status as spouse.  While awaiting approval of their petition and application, Mr. Norris died on January 9, 2004, one year and 4 months after their marriage.  Defendants denied the joint petition and application on February 2, 2004, due to the death of Mr. Norris.  Mrs. Hassan-Norris filed a Motion to Reopen Removal Proceedings on December 31, 2008, and on January 21, 2009, was issued a notice of departure to Sierra Leone on February 23, 2009.[4]  The Petitioners bring this action seeking declaratory, injunctive, and mandamus relief.

## STATUTORY BACKGROUND

The Immigration and Nationality Act ("INA") establishes a quota on the number of immigrant visas that can be issued each year.  8 U.S.C. § 1151(a) (2006).  However, § 1151(b) defines categories of aliens, namely "immediate relatives," who are exempt from the quota limits.  Of relevance in this case, § 1151(b)(2)(A)(i) states:

> **Immediate Relatives** - For purposes of this subsection, the term
> 'immediate relatives' means the children, spouses, and parents of a
> citizen of the United States, except that, in the case of parents, such
> citizens shall be at least 21 years of age.  In the case of an alien who was
> the spouse of a citizen of the United States for at least 2 years at the time
> of the citizen's death and was not legally separated from the citizen at
> the time of the citizen's death, the alien (and each child of the alien) shall

---

[4] There is a slight dispute between the parties on Mrs. Hassan-Norris's current status.  The Government claims that there is a warrant for Mrs. Hassan-Norris's deportation, while her counsel argues that deportation is automatically stayed pending resolution of her motion to reopen.  However, this Court believes that her deportation status does not affect the analysis of this Opinion.

3

> be considered, for purposes of this subsection, to remain an immediate
> relative after the date of the citizen's death but only if the spouse files a
> petition under section 1154(a)(1)(A)(ii) of this title within 2 years after
> such date and only until the date the spouse remarries . . . .

In order to qualify for this exemption, generally both the citizen spouse and the alien relative file separate forms with the USCIS to seek adjustment of the alien's status to lawful permanent alien. The citizen relative may file a Form I-130 ("petition") establishing the alien as the spouse, child, or parent of the citizen and thus qualifying the alien to receive an immediate visa as an immediate relative upon approval. § 1154(a)(1)(A)(i); 8 C.F.R. §§ 204.1(a)(1), 204.2(a) (2006). The USCIS then conducts an investigation of the I-130 Form and determines whether the marriage is valid and whether the alien otherwise meets the definition of an "immediate relative." § 1154(b). Upon determining that the marriage is valid, the USCIS must approve the Form I-130 petition. *Id.* The alien immediate relative also files a Form I-485 application seeking to have his or her immigrant status adjusted to lawful permanent resident. § 1255(a); 8 C.F.R. § 245.1(a). In order for the USCIS to approve Form I-485, an immigrant visa must be immediately available to the alien, which cannot usually be obtained without approval of Form I-130. *Id.* Thus, the USCIS must first approve the Form I-130 petition classifying the alien as an immediate relative and then separately approve the Form I-485 application before an alien spouse, and his or children, can have their status adjusted to lawful permanent resident.

Section 1154(b) permits the alien spouse, as described in the second sentence of § 1151(b)(2)(A)(i), to file a self-petition Form I-360, but only if the alien spouse was married to the citizen spouse for at least two years prior to the citizen's death. However, as is the case here, where the citizen spouse filed a Form I-130 petition but dies before the petition and application are approved, and prior to the couple's second year of marriage, the USCIS treats the citizen's death as automatically making the widowed alien, and his or her children, ineligible for

classification as an "immediate relative." (Doc. No. 8 at 11.) Unless the alien otherwise qualifies for a visa, the alien spouse's I-485 application is denied, along with the privilege to work, travel, and often to remain in the United States. *See* § 1154 (a)(1)(A)(i). As a result, the alien spouse and children are placed in removal proceedings and are subject to deportation. *Id.*

## STANDARD OF REVIEW

When a party moves to dismiss a complaint based on lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court must consider whether it has the competence to hear the case. *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). Where a party is suing the United States, it has the burden of proving subject matter jurisdiction because the "party who sues the United States bears the burden of pointing to an unequivocal waiver of immunity." *Williams v. United States,* 50 F.3d 299, 304 (4th Cir.1995) (citations omitted). Upon finding that the complaint fails to allege facts upon which the Court may exercise its jurisdiction, a motion to dismiss for lack of subject matter jurisdiction is properly granted. *Davis*, 367 F. Supp. 2d at 799.

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Generally, a complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Nevertheless, the Supreme Court had directed courts that "Rule 8 still requires a 'showing,'" of "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007). In its determination, the Court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v.*

5

*Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). In sum, "factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted).

Where a motion for dismissal pursuant to Rule 12(b)(6) relies on matters outside the pleadings, the Court treats it as a motion for summary judgment. Fed. R. Civ. P. 12(d). Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must provide evidence that shows a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998). When parties file cross motions for summary judgment, the court must view

each motion in the light most favorable to the non-movant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

There are no material facts disputed in this case. The pivotal issue in this the case involves a question of law as to whether the Government wrongfully interpreted § 1151(b)(2)(A)(i) to exclude the Petitioners' from the definition of "immediate relative." Both parties agree to the relevant chronology of the events, that USCIS denied Petitioners "immediate relative" status, and that USCIS's denial of their I-130 petition was based solely on the ground that their citizen spouse died before the couples were married two years and prior to approval of their forms. Therefore, the Court has jurisdiction to review the Petitioners' challenge to the Government's statutory interpretation of § 1151(b)(2)(A)(i) and can reach its decision based on the undisputed facts outlined above.

## ANALYSIS

I. **Jurisdiction**

Petitioners assert that their complaint does "not challenge the adjudication of their I-485 applications for adjustment of status; rather, Plaintiffs challenge the Defendants' unlawful interpretation of 'immediate relative' which resulted in the automatic denial of their I-130 petitions." (Doc. No. 11 at 3.) Thus, the Petitioners argue that this Court has jurisdiction to hear their statutory interpretation challenge under 28 U.S.C. § 1331 and section 704 of the Administrative Procedure Act, 5 U.S.C. § 704, because their claim raises a purely legal question for the Court's review. In fact, no other court ruling on this precise issue has held that jurisdiction is improper in the district court. *Robinson v. Napolitano*, 554 F.3d 358, 360 (3rd Cir. 2009); *Lockhart v. Chertoff,* 2008 WL 80225, at *4 (N.D. Ohio Jan. 7, 2008), aff'd, 573 F.3d 251

(6th Cir. 2009)[5]; *see Taing v. Napolitano*, 567 F.3d 19, 22-23 (1st Cir. 2009); *Freeman v. Gonzales*, 444 F.3d 1031, 1037 (9th Cir. 2006). Thus, this Court is satisfied that Petitioners have met their burden of proving that subject matter jurisdiction is proper in this case.

Despite these decisions, however, the Government contends that various provisions of 8 U.S.C. § 1252 strip this Court of jurisdiction to hear matters once the Petitioners are in removal proceedings. The Government bases its jurisdictional arguments on its belief that the Petitioners' challenge to the Government's statutory interpretation of "immediate relative" is merely a repackaged challenge to the denial of their I-485 applications, which the Government argues is subject to review only by an immigration judge and requires the exhaustion of administrative procedures.

In support of its argument that this Court lacks jurisdiction, the Respondents cite to 8 U.S.C. § 1252(b)(9), which provides that, "no court shall have jurisdiction" to review any questions of law, including the "interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien. . . ." Respondents claim that § 1252(b)(9) has been "interpreted broadly as indicative of Congressional intent to 'channel' all legal issues with respect to an alien in removal proceedings to the immigration judge (IJ), with a right to appeal to the Board of Immigration Appeals (BIA), and ultimately to a Court of Appeals." (Doc. No. 14 at 3) (citing *Aguilar v. U.S. Immigration & Customs Enforcement*, 510 F.3d 1, 9 (1st Cir. 2007).) However, as pointed out by Petitioners, the court in *Aguilar* did not interpret § 1252(b)(9) so broadly as to completely preclude judicial review of claims brought by aliens who are in the removal process. To the contrary, the court in *Aguilar* found the "words 'arising from' in § 1252(b)(9)" to have a narrow meaning and did not

---

[5] Petitioners highlight that the Government conceded that the district court had jurisdiction in their Final Opening Brief filed in the appeal of *Lockhart v. Napolitano*. (Final Opening Br. For Resp't-Appellant 1.)

apply to judicial review of matters "independent of, or wholly collateral to, the removal process," or "that cannot effectively be handled through the available administrative process." *Id.* at 11. As the court in *Aguilar* explained, "courts have been more willing to find an issue collateral when exhaustion of administrative procedures would be futile." *Id.* at 12 (citations omitted). As articulated in *Lockhart v. Chertoff*, the immigration judge lacks jurisdiction to review denial of I-130 petitions, because it is a non-discretionary determination, and since Petitioners need approval of the I-130 petition to become eligible for adjustment of status, "it would be futile for [Petitioners] to renew the [I-485] application in [their] removal proceedings." 2008 WL 80225, at *5.

Following the *Aguilar* court's logic, this Court believes that Petitioners' challenge to the Government's denial of their husbands' I-130 petitions is a collateral issue to the actual denial of their I-485 applications. *See Lockhart v. Chertoff,* 2008 WL 80225, at *4 (stating "determination for adjustment of status – unlike the granting of adjustment itself – is a purely legal question"). In fact, as both Petitioners and the Government explain, a grant of a citizen spouse's I-130 petition does not automatically lead to approval of an alien's I-485 application. Furthermore, because this Court finds that Petitioners are not asking it to review and overrule the denial of their I-485 application, although the Court's determination of the statutory meaning of "immediate relative" could possibly lead to such an outcome, the Government's assertion that various other provisions of § 1252 strip this Court of jurisdiction is unpersuasive.[6] Moreover,

---

[6] This Court does not consider persuasive Respondents' reliance on 8 U.S.C § 1252(g) and case law foreclosing judicial review of the director's denial of an alien's application because the Court finds that Petitioners in this case are seeking review of the I-130 petitions, not their I-485 status adjustment applications. Furthermore, § 1252(a)(2)(B) applies only to the sections enumerated therein and to grants of relief subject to the discretion of the Attorney General or Secretary of DHS. Because the statute at issue is not enumerated in § 1252(a)(2)(B)(i) and the agency's decision to approve or deny I-130 petitions is non-discretionary, § 1252(a) does not strip this Court of jurisdiction. Moreover, the Court has reviewed the holdings of the Fourth Circuit cases the Respondents claim supports its argument that this Court lacks jurisdiction and agrees with Petitioners that those cases all dealt with the Court's ability to review § 1255 of the INA, which is specifically enumerated in § 1252(a)(2)(B)(i). Lastly, the

because other federal courts have exercised jurisdiction to review this exact issue, this Court is not persuaded by the Government's policy argument that it should refrain from exercising jurisdiction to prevent the creation of conflicting laws that would lead to unfair differential treatment of aliens depending upon in which district they reside. Therefore, this Court has jurisdiction for the limited purpose of interpreting the statutory meaning of "immediate relative" under § 1151(b)(2)(A)(i).

## II.    Interpretation

Other circuit and district courts, deciding the same challenge presented by Petitioners on essentially indistinguishable facts, have reached inconsistent results on the meaning of "immediate relative" under § 1152(b)(2)(A)(i), with three circuit decisions in favor of Petitioners and one circuit court and two district courts ruling for Respondents.[7] *Compare Lockhart*, 573 F.3d at 251; *Taing*, 567 F.3d at 19; and *Freeman*, 444 F.3d at 1031, *with Robinson*, 554 F.3d at 358; *Turek v. Dep't of Homeland Sec.*, 450 F. Supp. 2d 736 (E.D. Mich. 2006); and *Burger v. McElroy*, 1999 WL 787661, at *1 (S.D.N.Y. 1999). The Fourth Circuit has not decided this matter, and with no clear precedent to follow, this Court must resort to the canons of statutory interpretation to decide whether Petitioners' or Respondents' interpretation of the statute is correct.

In considering an agency's interpretation of a statute that it administers, the Court must determine whether *Chevron* deference is required. *Taing*, 567 F.3d at 23. This involves a two-step process in which the Court must first determine whether the language of the statute is

---

Court agrees with Petitioner that the Real ID Act, 8 U.S.C. § 1252(a)(2)(D), which permits Court of Appeals to review constitutional challenges to the discretionary relief provided under § 1252(a)(2)(B)(i), does not relate to the non-discretionary agency action challenged in this case.

[7] The Court also notes that DHS has temporarily deferred action on adjustment of status forms for widowed aliens, and their minor children, "who reside in the United States and who were married for less than two years prior to their spouse's death." Press Release, U.S. Dep't of Homeland Sec., DHS Establishes Interim Relief for Widows of U.S. Citizens (June 9, 2009), http://www.dhs.gov/ynews/releases (follow "Archives" hyperlink; then follow "June 2009" hyperlink; then follow "DHS Establishes Docterim Relief for Widows of U.S. Citizens" hyperlink).

"susceptible to more than one natural meaning." *Id.* (quoting *Strickland v. Comm'r, Me. Dep't Human Servs.*, 96 F.3d, 542, 547 n.5 (1st Cir. 1996)). If "the statutory text is plain and unambiguous," the Court and agency "must give effect to the unambiguously expressed intent of Congress," thereby ending the "interpretative odyssey." *Id.* (quoting *Carcieri v. Salazar*, 129 S. Ct. 1058, 1063-64 (2009)). Thus, under the first step, if the Court finds that Congress's intent is expressly apparent on the face of the statute, then there is no need to defer to the agency's interpretation. *Id.* (citations omitted). On the other hand, should this Court find that the language of the statute is "ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). However, "Chevron deference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *Succar v. Ashcroft*, 394 F.3d 8, 22 (1st Cir. 2005) (quoting *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004)).

Here, after considering both Petitioners' and Respondents' arguments, the Court agrees, as do most of the other courts deciding this issue, that the plain and unambiguous language of § 1151(b)(2)(A)(i) does not strip Petitioners of eligibility for classification as an immediate relative simply because their citizen spouses died before their second wedding anniversary. Accordingly, the Court finds it unnecessary to proceed to the second step of the *Chevron* deference test.

**A. Congress's Intent Is Clear and Unambiguous from the Language of the Statute and does not Automatically Strip Petitioners of "Immediate Relative" Status Solely Because of the Death of their Citizen Relative.**

The Court must begin its review of statutory construction with the language of the statute itself. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989). The statute at issue here provides:

> For purposes of this subsection, the term "immediate relatives" means the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age. In the case of an alien who was the spouse of a citizen of the United States for at least 2 years at the time of the citizen's death and was not legally separated from the citizen at the time of the citizen's death, the alien (and each child of the alien) shall be considered, for purposes of this subsection, to remain an immediate relative after the date of the citizen's death but only if the spouse files a petition under section 1154(a)(1)(A)(ii) of this title within 2 years after such date and only until the date the spouse remarries . . . .

§ 1151(b)(2)(A)(i).

At issue in this case is the meaning of "spouse" as used in the first and second sentences of this section, and whether the Petitioners must be the spouse of a U.S. citizen at the time the petition and application are filed or adjudicated. Respondents argue that the two-year marriage requirement located in the second sentence of § 1151(b)(2)(A)(i) applies to the term "spouse" in the first sentence because the alien must "currently" be the spouse of a U.S. citizen when the petition and application are adjudicated. The Petitioners contend that there is no qualification on the term "spouse" in the first sentence and that Congress merely created a separate right, and set of requirements, for aliens to self-petition for adjustment of status when the citizen spouse failed to file a petition on their behalf prior to the citizen's death.

### 1. The Ordinary Meaning of "Spouse" Does not Terminate Upon the Death of One of the Parties to the Marriage.

The INA defines "spouse" in the negative and is not relevant or helpful to the issue in this case. § 1105(a)(35) (stating the terms "spouse", "wife", or "husband" do not include a spouse, wife, or husband by reason of any marriage ceremony where the contracting parties thereto are not physically present in the presence of each other, unless the marriage shall have been consummated"). Thus, the Court must look to the "common, ordinary meaning of the words of the statute at the time of enactment." *Taing*, 567 F.3d at 24 (citations omitted).

Respondents assert that the ordinary meaning of the term "spouse" supports their belief that a spouse can only be a person who "is currently married" and that "the general rule in the United States is that marriage ends upon death of one spouse." (Doc. No. 8 at 23.) First, Respondents' reference to the 8th Edition of Black's Law is inapplicable because only the 6th edition was available when Congress amended § 1151 in 1990, and in any event, neither edition uses the word "current" in defining "spouse." As the Petitioners argue, and as found persuasive by other courts, the 6th Edition of Black's Law includes "surviving spouse" under the heading for the definition of "spouse." *Lockhart*, 573 F.3d at 258; *Taing*, 567 F.3d 25-26. Black's Law defines "spouse" as follows: "Spouse. One's husband or wife, and 'surviving spouse' is one of a married pair who outlive the other." Black's Law Dictionary 1402 (6th ed. 1990). Although not argued by either party, Black's Law defines "surviving spouse" as follows: "the *spouse* who outlives (survives) the other spouse. Term commonly found in statutes dealing with probate, administration of estates, and estate and inheritance taxes." Id. at 1446 (emphasis added). Accordingly, this Court is persuaded that the common and ordinary use of the term "spouse" is not limited to married couples where both parties are still living.[8]

In support of their interpretation, Respondents inform the Court that it is required to read the first and second sentences of § 1151(b)(2)(A)(i) together. Doing so, they claim, should make clear that Congress has generally defined immediate relative as a "current" spouse and provided an exception to this definition for an "'alien who *was* the spouse" of a citizen "if the marriage lasted two years." (Doc. No. 8 at 22.) Respondents place great significance on Congress's use of the present tense in the first sentence of §1151(b)(2)(A)(i) and its use of the past tense in the

---

[8] Petitioners and Respondents attempt to further support their views on the ordinary meaning of spouse by referencing statutes of various states. This Court does not need to look to those statutes to reach its conclusion that the plain language of the statute in issue clearly demonstrates that Congress intended to continue using the term "spouse" when referring to widow or widower aliens.

second sentence.  Petitioners counter that Respondents read the phrases in isolation, contrary to the "well settled canons of statutory interpretation."  (Doc. No. 11 at 28.)  They argue that a collective reading of the statute will put the term "spouse" in context and will clearly show that Congress uses the word "spouse" when referring to widowed aliens.

      This Court agrees that Congress's continued use of the term "spouse" later in the second sentence supports Petitioners' argument that Congress intended for the term "spouse" to refer to both "a living spouse and a surviving spouse," as did the First and Sixth Circuit.  *Lockhart*, 573 F.3d at 257-58; *Taing*, 567 F.3d at 277.   Although the beginning of the second sentence uses the past tense, stating "in the case of an alien who *was* the spouse of a citizen," midway through the sentence Congress continues to call the widowed alien a spouse when it states, "but only if *the spouse* files a petition . . . ."  § 1151(b)(2)(A)(i) (emphasis added).  Interestingly, Congress has twice used the term "spouse" when referring to a widowed alien.  Thus, as explained by the First Circuit in *Taing* and the dissent in *Robinson*, restricting the term "spouse" to a marriage where both parties are living would result in Congress using the same word with inconsistent meanings within the same sentence. *Taing*, 567 F.3d at 277; *Robinson*, 554 F.3d. at 369 (Nygaard, J., dissenting) (explaining "one of the principal rules of statutory construction is to give terms consistent meanings.").  Moreover, Congress's use of the past tense was most likely a grammatical decision, otherwise the beginning of the second sentence would nonsensically read as follows:  "In the case of alien who *is* the spouse of a citizen of the United States for at least 2 years at the time of the citizen's death . . . ."  Therefore, this Court finds no indication within the language of the statute that Congress intended to stop using the term "spouse" upon the death of one party to a marriage, and instead unambiguously expresses Congress's intent that the term "spouse" continues to refer to the party of the marriage who outlives the other.

## 2. The Plain Language of the Statute Unambiguously Shows Congressional Intent for the Alien to be the Spouse of a U.S. Citizen When the Petition was Filed, not Adjudicated.

The Respondents' most compelling argument in support of its interpretation is that Congress's requirement that the Secretary investigate every visa petition will be frustrated if an alien remains the spouse of a deceased citizen before the petition is adjudicated. Respondents emphasize that § 1154(b) directs that the Secretary of Homeland Security shall approve the immediate relative visa petition only if, "after investigation of the facts in each case, . . . [the Secretary] determines that the facts stated in the petition **are** true and that the alien in behalf of whom the petition is made is an immediate relative . . . ." (Doc. No. 8 at 29) (emphasis added by Respondents.) Respondents place great weight on Congress's use of the present tense in this provision to reach its conclusion that Congress intended the two-year marriage requirement to apply to aliens whose citizen relative filed a petition on their behalf but who were no longer living when the Secretary sought to investigate the validity of the marriage.[9]

As further support of this view, Respondents rely on *Matter of Alarcon* and *Perez v. Vargas*. However, as Petitioners argue, neither decision is instructive on the issue pending before the Court. First, *Matter of Alarcon*, decided by the Board of Immigration Appeals, addressed an application for admission into the United States on an immigrant visa. 20 I. & N. Dec. 557, 562 (BIA 1992). Thus, as the court in *Lockhart* explained, § 1154(b) "relate[d] to visa petitions and not Form I-130 petitions." 2008 WL 80255, at *24. Second, the Fourth Circuit's decision in *Perez v. Vargas* is limited to adjustment of status in the context of employment, and

---

[9] This Court understands the Respondents may be concerned about verifying the validity of a marriage that lasted for less than two years where it can no longer question one party to the marriage. However, Respondents misplace the emphasis in the statute that it references because what must be true at the Secretary's investigation is "the facts *stated in the petition*." (emphasis added). The Court believes that although the agency's task of determining the validity of the marriage is made more difficult when the citizen spouse is unavailable for questioning, it is not thereby rendered impossible. The agency could rely on the methods it uses when investigating alien self-petitions. As the dissent in *Robinson* emphasized, the Petitioners who fully complied with INA procedure should not be removed "simply because the petition filed on their behalf by [their deceased] husband is stuck in the government's bureaucracy." *Robinson*, 554 F.3d at 367.

although the court stated that "even when an alien is eligible for adjustment of status, he can lose his eligibility under certain circumstances" the very next sentence explains that "this can occur when the alien is no longer employed by the employer who submitted the visa petition." 478 F.3d 191, 192.

Furthermore, as both the Sixth and Ninth Circuit found, determining eligibility for classification as "immediate relative" solely at adjudication would lead to arbitrary results. See *Lockhart*, 573 F.3d 251; Freeman, 444 F.3d at 1040-41. Petitioners direct this Court's attention to 8 U.S.C. § 1186(a), which as quoted from *Freeman*, essentially provides that

> [an] alien spouse who receives permanent resident status as an immediate relative before the second anniversary of her qualifying marriage does so on a conditional basis, and if the Attorney General determines that prior to the second anniversary of the alien's obtaining status that the alien's marriage has been judicially annulled or terminated, *other than through the death of a spouse*, [the Attorney General] shall terminate the permanent resident status of the alien.

*Freeman*, 444 F.3d at 1042 (emphasis added).

Thus, as the court in *Lockhart* explained, had the Respondents processed the Petitioners' application and their citizen spouses' petition during the months between filing the forms and the citizens' death and granted the Petitioners lawful permanent resident status, the Respondents could not have revoked that determination solely on the subsequent death of the citizen. See *Lockhart*, 573 F.3d 251. Thus, this Court agrees with Petitioners that determining an alien spouse's qualification for adjustment of status at the time of adjudication will result in finding that Congress intended the absurd and arbitrary result that "an alien spouse [married for only a short period but] who experienced a quick adjudication . . . to be completely insulated from termination of her permanent resident status" while at the same time automatically denying permanent status to an alien, whose citizen spouse died just shy of the couple's second year of marriage, solely because her forms where not processed as quickly. (Doc. No. 17 at 20.)

Therefore, this Court finds that the language in the INA statute unambiguously expresses Congress's intent not to automatically strip an alien of "immediate relative" status where the citizen spouse submitted an I-130 petition but died prior to its adjudication.

### 3. The Plain and Unambiguous Language of the Statute Indicates Congressional Intent to Provide a Separate Right for Aliens to Self-Petition Where the Citizen had not Done so Prior to His or Her Death.

Petitioners argue that the second sentence of § 1151(b)(2)(A)(i) creates a separate right for aliens to self-petition when their citizen spouses did not file a petition on their behalf before their death. They claim that the two-year marriage requirement in the second sentence only applies to aliens in that position. Respondents assert, however, that Congress intended for the second sentence's two-year marriage requirement to apply to the term "spouse" in the first sentence.

Petitioners finds support for their argument in § 1154(a) which governs the petitioning procedure for granting immigrant status. Under § 1154(a)(i), "any citizen of the United States claiming that an alien is entitled . . . to an immediate relative status under section 1151(b)(2)(A)(i) of this title may file a petition with the Attorney General for such classification." However, § 1154(a)(ii) provides that "an alien spouse described in the second sentence of 1151(b)(2)(A)(i) of this title may file a petition with the Attorney General under this subparagraph for classification . . . under such section." Thus, the clear statutory structure of separating the procedure for a citizen petition from an alien petition provides persuasive support for the Petitioners' argument. This Court is further convinced by the holdings in *Lockhart*, *Taing*, and *Freeman* that the second sentence of § 1151(b)(2)(A)(i) was intended to create a separate right, and separate set of requirements, for aliens to self-petition when their citizen spouse had not filed on their behalf and does not apply to an alien who qualifies as a "spouse"

17

under the first sentence of the statute.  *Lockhart*, 573 F.3d at 257; *Taing*, 567 F.3d at 26-27; *Freeman*, 444 F.3d at 1039.

### B. Chevron Deference is not Required.

Finally, the Government argues that Chevron deference is required if 8 U.S.C. § 1151(b)(2)(A)(i) is ambiguous.  Thus, they contend that the Court must defer to the agency's interpretation in *Matter of Varela*, 13 I. & N. Dec. 453 (BIA 1970), that an alien can no longer be considered the spouse of a citizen who dies and thus no longer qualifies for immediate relative status unless the marriage lasted at least two years.  Because this Court finds that the language of the statute in question clearly demonstrates that Congress did not intend to strip an alien of classification as the spouse of a citizen solely because of the citizen's death before the couple's second wedding anniversary, it is not required to defer to the agency's interpretation.  As articulated by the Sixth Circuit in *Lockhart*, even if the Court had found that the language of the statute was ambiguous, it would not have to defer to the decision in *Matter of Varela* because it is non-precedential.  *Lockhart,* 573 F.3d at 262 (explaining that the BIA in *Matter of Sano*, 19 I. & N. Dec. 299 (BIA 1985), held that that the BIA in *Matter of Varela* lacked jurisdiction "to decide whether a beneficiary alien-spouse remains a 'spouse' under § 1151(b)(2)(A)(i) when his or her spouse dies prior to adjudication of an adjustment of status application").  Furthermore, as held in both *Freeman* and *Lockhart*, *Matter of Varela* lacks the "necessary statutory" analysis to entitle it to Chevron deference.  *Id.* (citations omitted).

### CONCLUSION

For the forgoing reasons, this Court finds that the plain language of 8 U.S.C. § 1151(b)(2)(A)(i) does not automatically strip an alien, whose citizen spouse filed an I-130 petition but died before it was adjudicated, from classification as an "immediate relative" solely because the citizen died before the couple's second wedding anniversary.  Therefore, this Court

**GRANTS** Petitioners Cross Motion for Summary Judgment (Doc. No. 11) and **DENIES** Respondents Motion to Dismiss, or Alternatively, for Summary Judgment (Doc. No. 8).  A separate Order shall follow this Opinion.